UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
CYNTHIA L. MONTERROSO,

               Plaintiff,

        v.

SULLIVAN & CROMWELL LLP,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

No. 06-CV-3404 (SAS)

## DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

        Pursuant to Local Civil Rule 56.1, defendant Sullivan & Cromwell LLP respectfully submits the following statement of facts as to which there is no genuine issue to be tried for purposes of defendants' April 29, 2008 motion for summary judgment only.

*Defendant's Accommodations of Plaintiff's Claimed Disability*

      (1)     Defendant employed plaintiff as a secretary from June 28, 1993 to March 10, 2006.  (Affidavit of Susan Vahrenkamp ("Vahrenkamp Affidavit") at ¶ 3.)

      (2)     On September 17, 2004, plaintiff left work (on a Friday) because of alleged breathing problems, sought treatment in a hospital emergency room and called in sick the following Monday and Tuesday.  (Vahrenkamp Affidavit at ¶ 4.)

      (3)     Three weeks later, on October 8, 2004, plaintiff again left work early (again on a Friday) to seek treatment in an emergency room, claiming that her breathing difficulties were caused by the "fumes" from the firm's Reproduction/Photocopy Department which is located on the 28th floor of the firm's offices.  (Vahrenkamp Affidavit at ¶ 5.)

(4)     After the incident on October 8, 2004, plaintiff was out of work for eight consecutive work days, from October 11, 2004 to October 20, 2004.  (Vahrenkamp Affidavit at ¶ 6.)

(5)     Because plaintiff had already exhausted her sick leave for 2004, she was not paid for this eight-day absence until her claim was approved by the firm's worker's compensation insurance carrier.  (Affidavit of Melanie Corpuz ("Corpuz Affidavit") at ¶ 4.)

(6)     During her eight-day absence, plaintiff told the firm's Secretarial Services Department that she would not return to work until she was transferred to a new position off the 28th floor.  (Vahrenkamp Affidavit at ¶ 7.)

(7)     The firm accommodated plaintiff's request and transferred her from the 28th floor, but because there was not a permanent position open on another floor, plaintiff was moved temporarily into a floating position.  (Vahrenkamp Affidavit at ¶ 8.)

(8)     When plaintiff returned to work on October 21, 2004, she met with Susan Vahrenkamp, Director of the firm's Secretarial Services Department, and Catherine Kabelac, Assistant Director of the firm's Secretarial Services Department.  (Vahrenkamp Affidavit at ¶ 9.) Ms. Vahrenkamp explained to plaintiff that because plaintiff did not want to work on the 28th floor, she would have to work in a floating position until a new position opened on another floor. (Vahrenkamp Affidavit at ¶ 9.)

(9)     During this meeting, plaintiff complained that she would have difficulty wheeling her ergonomic chair (an accommodation the firm had provided to plaintiff for years) and work supplies to a new work station as her floating assignment required.  (Vahrenkamp Affidavit at ¶ 9.)  In response, Ms. Vahrenkamp offered plaintiff the use of a storage locker to hold her supplies, an offer that plaintiff rejected.  (Vahrenkamp Affidavit at ¶ 9.)

(10)  Although plaintiff rejected the offer to use a storage locker, the firm sought to assist plaintiff in her new position, and each day a member of Secretarial Services (including managers) wheeled plaintiff's ergonomic chair, box with personal supplies, and coffee mug to her morning assignment.  (Vahrenkamp Affidavit at ¶ 10.)

(11)  Plaintiff floated for the following month, and although she was offered permanent positions that opened up, she declined to be considered for them because they involved assisting firm partners or helping with overflow work from partners.  (Vahrenkamp Affidavit at ¶ 11.)

(12)  On November 4, 2004, plaintiff was given a stationary position on the 33rd floor.  (Vahrenkamp Affidavit at ¶ 12.)  As an accommodation, the firm allowed her to continue in this position for two months, even though the work load was low and staffing the position frequently was not necessary.  (Vahrenkamp Affidavit at ¶ 12.)

(13)  Beginning on January 10, 2005, plaintiff was out of work for an extended period because of alleged back problems.  (Vahrenkamp Affidavit at ¶ 13.)

(14)  On February 25, 2005, plaintiff notified the firm that her doctor had released her to return to work.  (Corpuz Affidavit at ¶ 5.)

(15)  As it does with all employees who wish to return to work from disability or workers' compensation leave after being released by their doctors, the firm's Benefits Department asked that plaintiff provide a Fit to Return note before allowing her back to work.  (Corpuz Affidavit at ¶ 5.)

(16)  Plaintiff provided a Fit to Return note that contained restrictions regarding her ability to perform certain tasks and also stated that she had pain in her back and legs.  (Corpuz Affidavit at ¶ 6.)

(17)     These restrictions were of concern to Benefits, and the firm decided that plaintiff should undergo an Independent Medical Examination ("IME") before returning to work. (Corpuz Affidavit at ¶ 7.)

(18)     The firm received the IME results on March 16, 2005, and the IME report stated that the plaintiff could work within her job description. (Corpuz Affidavit at ¶ 8.)

(19)     The IME report also stated that plaintiff should have an ergonomic chair, as well as an ergonomic workstation evaluation, and no lifting of anything more than 10 pounds. (Corpuz Affidavit at ¶ 8.) The firm accommodated Ms. Monterroso by providing her with all of the IME doctor's recommendations. (Corpuz Affidavit at ¶ 8.)

(20)     On March 21, 2005, the firm allowed plaintiff to return to work. The firm paid the plaintiff at full salary during her entire absence. (Corpuz Affidavit at ¶ 9.)

(21)     In accordance with the IME report's recommendations, plaintiff was no longer required to float. (Vahrenkamp Affidavit at ¶ 14.) Instead, because there was not a permanent position yet available, plaintiff was assigned to assist the Secretarial Services Department by answering phones. (Vahrenkamp Affidavit at ¶ 14.)

(22)     On March 28, 2005, a permanent associate secretarial position opened up on the 35th floor and plaintiff was assigned to it. (Vahrenkamp Affidavit at ¶ 15.) The firm sought to assign plaintiff to one of the higher floors in its building because plaintiff had indicated that she found the physical configuration of those floors more comfortable. (Vahrenkamp Affidavit at ¶ 15.)

(23)     On April 5, 2005, plaintiff left work and took a firm car service to an emergency room, claiming that she was having breathing difficulties, which she attributed to

cleaning solutions used by the firm's Maintenance Department. (Vahrenkamp Affidavit at ¶ 16.) Plaintiff called in sick the next day. (Vahrenkamp Affidavit at ¶ 16.)

(24) Upon her return to work on April 7, 2005, plaintiff met with Sharron Davis, the Director of the firm's Human Resources Department, and Ms. Vahrenkamp, who told plaintiff that it would be difficult for her to retain a permanent work station if her lengthy absences continued. (Vahrenkamp Affidavit at ¶ 17; Affidavit of Sharron Davis ("Davis Affidavit") at ¶ 3.) Ms. Davis explained that because permanent secretaries support specific, assigned lawyers, they must be present daily to ensure continuous secretarial coverage. (Vahrenkamp Affidavit at ¶ 17; Davis Affidavit at ¶ 3.) Ms. Davis also told plaintiff that because attendance was an essential function of a permanent work station, plaintiff's employment could be terminated. (Vahrenkamp Affidavit at ¶ 17; Davis Affidavit at ¶ 3.)

(25) On May 18, 2005, accompanied by Catherine Kabelac, the Assistant Director of the firm's Secretarial Services Department, plaintiff again took a firm car service to an emergency room, claiming that she had had an asthmatic reaction to furniture polish being used near her desk area. (Vahrenkamp Affidavit at ¶ 18.) Plaintiff also called in sick the next day. (Vahrenkamp Affidavit at ¶ 18.)

(26) Five days later, plaintiff once again took a firm car service to an emergency room complaining of another asthmatic reaction to furniture polish. (Vahrenkamp Affidavit at ¶ 19.) Plaintiff called in sick the following two days. (Vahrenkamp Affidavit at 19.)

*Plaintiff's Refusal to Engage in the Interactive Process*

(27) After this last incident, the firm, in conjunction with its workers' compensation carrier, decided that plaintiff should have an IME to assess her physical limitations to determine if she could safely return to work. (Vahrenkamp Affidavit at ¶ 21; Corpuz Affidavit at ¶ 10.)

(28) Additionally, Ms. Vahrenkamp called plaintiff at home and told her that she needed to obtain a medical report from a pulmonologist so that the firm could begin assessing whether she needed any further accommodation, and whether any such accommodation would be feasible. (Vahrenkamp Affidavit at ¶ 21.)

(29) Plaintiff was then placed on paid administrative leave by the firm. (Vahrenkamp Affidavit at ¶ 21.)

(30) On or about May 27, 2005, the firm received a letter from Dr. James L. Bruno, plaintiff's pulmonologist, stating that plaintiff should not be exposed to "pulmonary-offending agents such as chemicals, fumes, toxins, etc. as these harmful exposures will worsen her respiratory condition." (Corpuz Affidavit, Ex. 1.) Dr. Bruno also sent a Fit to Return note dated May 31, 2005 with a reference to his May 27 letter. (Corpuz Affidavit at ¶ 12.)

(31) To assess an appropriate accommodation, however, the firm needed more specific information than Dr. Bruno's general references to "pulmonary-offending agents." Accordingly, on June 1, 2005, Ms. Corpuz wrote to Dr. Bruno requesting more specific information about plaintiff's condition. (Corpuz Affidavit ¶ 13 and Ex. 1.)

(32) Ms. Corpuz followed up with phone call to Dr. Bruno's office on June 8, 2005, and spoke with Elizabeth Bruno. (Corpuz Affidavit at ¶ 15.) Mrs. Bruno told Ms. Corpuz that Dr. Bruno had stated it was impossible to pinpoint and list the exact causes of Ms. Monterroso's alleged asthma attacks, but that she would try to get more information from the doctor and get back to the firm. (Corpuz Affidavit at ¶ 15.)

(33) On June 9, 2005, Ms. Corpuz again spoke with Mrs. Bruno at Dr. Bruno's office. (Corpuz Affidavit at ¶ 16.) This time, Mrs. Bruno informed Ms. Corpuz that the plaintiff

had prohibited Dr. Bruno's office from responding any further to the firm's inquiries about plaintiff's alleged asthma. (Corpuz Affidavit at ¶ 16.)

(34) Discovery has revealed that on October 20, 2004, two days after she first began treatment with Dr. Bruno, plaintiff signed a HIPPA form specifically prohibiting Dr. Bruno from providing information to the firm. (Corpuz Affidavit, Ex. 6.)

(35) Plaintiff underwent a workers' compensation IME on June 23, 2005, but never authorized the firm's worker's compensation carrier to release the results to the firm. (Corpuz Affidavit at ¶ 11; Davis Affidavit at 4.)

(36) On July 12, 2005 and again on August 3, 2005, Ms. Corpuz wrote to plaintiff asking her to authorize Dr. Bruno to provide the firm with more specific information about what he meant in his letter dated May 27, 2005, with regard to "pulmonary-offending agents such as chemicals, fumes, toxins, etc." (Corpuz Affidavit, Exs. 2 and 4.) Ms. Corpuz also asked plaintiff to provide authorization for the firm's workers' compensation insurance carrier to release the results of her June IME. (Corpuz Affidavit, Exs. 2 and 4.)

(37) In reply, plaintiff only authorized Dr. Bruno to write another general letter, also dated May 27, 2005, which stated that plaintiff's asthma "may be exacerbated by exposure to various chemicals, fumes in the air." (Corpuz Affidavit, Exs. 3 and 5.) Plaintiff still did not authorize the release of her June IME results. (Corpuz Affidavit at ¶ 11 and Exs. 3 and 5.)

(38) On August 17, 2005, Ms. Davis, Director of the firm's Human Resources Department, wrote again to plaintiff asking her to obtain more detailed information from Dr. Bruno and to release the results of her June workers' compensation IME. (Davis Affidavit, Ex. 1.) Ms. Davis warned plaintiff that if she did not comply with these long-standing requests, her employment status might be affected. (Davis Affidavit, Ex. 1.)

(39) On or about September 14, 2005, plaintiff sent the firm a third letter from Dr. Bruno, this one dated August 24, 2008.  (Davis Affidavit, Ex. 3.)

(40) Dr. Bruno's August 24 letter set forth no professional opinion as to what in the workplace he thought could trigger plaintiff's asthma attacks.  (Davis Affidavit, Ex. 3.)  Rather, it simply stated *what plaintiff had told him*, namely, that she believed a list of generalized irritants such as "Aerosol furniture polish," "Asbestos," and "Reproduction chemicals" existed "in her work place" and "triggered her asthma attacks."  (Davis Affidavit, Ex. 3.)

(41) On December 2, 2005, after having given plaintiff over 27 weeks of paid administrative leave, the firm placed her on unpaid administrative leave in light of her continued failure to release the results of her workers' compensation IME as well as her failure to comply with the firm's repeated requests for reasonable medical documentation sufficient to allow it to assess her claimed need for accommodations.  (Davis Affidavit, Ex. 4.)

(42) Plaintiff continued to refuse to provide the requested information, and her employment was terminated on March 10, 2006.  (Davis Affidavit, Ex. 5.)

(43) Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on August 4, 2005, alleging that the firm discriminated against her under the Americans with Disabilities Act.  (Compl.)

(44) The EEOC issued a Right to Sue letter in January 2006, and plaintiff subsequently filed a complaint in the instant action on April 10, 2006.  (Compl.)

(45) Plaintiff has been unable to seek or perform (with or without accommodation) any employment since April 6, 2006.  (Fessel Decl., Ex. 1 at pgs. 12-14.)

*Plaintiff's Refusal to Take Corrective Medication*

(46) Plaintiff's pulmonologist, Dr. James Bruno, repeatedly advised plaintiff to use asthma maintenance medications to control symptoms of her alleged asthma, and plaintiff

repeatedly refused to use such medications.  (Fessel Decl., Ex. 2 at pgs. 27-28, 35-37, 41-42, 44-45, 51-52.)

(47) Plaintiff also refused to take non-steroidal asthma maintenance medications that Dr. Bruno attempted to prescribe to her.  (Fessel Decl., Ex. 2 at pg. 36.)

(48) In addition to asthma maintenance medications, Dr. Bruno prescribed plaintiff an Albuterol inhaler to use to alleviate her symptoms if she had an asthma attack.  (Fessel Decl., Ex. 2 at pg. 39.)

(49) Plaintiff testified at her deposition that she did not regularly carry an Albuterol inhaler with her, and she never used it to control her symptoms at the firm's offices.  (Fessel Decl., Ex. 1 at pg. 82.)

(50) Instead, whenever plaintiff purportedly suffered an asthma attack at the firm's offices, she would seek emergency care—all so that the emergency physicians could treat her with Albuterol and steroids, the *very same medication* she already had at her disposal but refused to use.  (Fessel Decl., Ex. 1 at pg. 81.)

Dated:   New York, New York
         April 29, 2008

         /s/ Robin D. Fessel_____
Robin D. Fessel (RF-9194)
   fesselr@sullcrom.com
Lisa M. White (LW-1870)
   whitelis@sullcrom.com
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
(212) 558-4000

*Attorneys for Defendant
Sullivan & Cromwell LLP*