**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
                  :

**CYNTHIA L. MONTERROSO,**

            **Plaintiff,**

        **- against -**

**SULLIVAN & CROMWELL, LLP,**

            **Defendant.**
-------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/28/08

**OPINION AND ORDER**

**06 Civ. 3404 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

Plaintiff Cynthia Monterroso, proceeding pro se, brings suit against Sullivan & Cromwell, LLP ("S&C" or the "Firm") under the Americans with Disabilities Act of 1990[1] (the "ADA") and Title VII of the Civil Rights Act of 1964[2] ("Title VII"). Plaintiff alleges that S&C discriminated against her on the following grounds: failure to accommodate her disability; unequal terms and conditions of employment; retaliation; and hostile work environment. S&C now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56(c), arguing that: plaintiff's reasonable accommodation claim fails as a matter of law; plaintiff has failed to establish a prima facie case of retaliation under the ADA; and plaintiff's hostile work environment claims under the ADA and Title VII are

---

[1]   Codified at 42 U.S.C. §§ 12112-12117.

[2]   Codified at 42 U.S.C. §§ 2000e - 2000e-17.

conclusory, without evidentiary support, and therefore lack merit. For the following reasons, defendant's motion is granted in part and denied in part.

## I.   BACKGROUND[3]

### A.   Plaintiff's Employment History

S&C employed Monterroso as a secretary for almost thirteen years, from June 28, 1993 to March 10, 2006.[4] On September 17, 2004, a Friday, plaintiff left work early because she had difficulty breathing.[5] Monterroso sought treatment in a hospital emergency room and called in sick the following Monday and Tuesday.[6]   Three weeks later, on October 8, 2004, plaintiff once again left work early to seek emergency room treatment for breathing difficulties.[7] Monterroso claimed that her breathing difficulties were caused by "fumes" from

---

[3]   Plaintiff did not respond to the numbered paragraphs of Defendant's Statement of Undisputed Material Facts submitted pursuant to Local Civil Rule 56.1 ("Def. 56.1"). Instead, plaintiff submitted her own numbered paragraphs in Plaintiff's Statement of Undisputed Material Facts ("Pl. 56.1"), which contains citations to Plaintiff's Affidavit in Opposition to Defendant's Motion for Summary Judgment ("Pl. Aff."). Accordingly, only those facts not in dispute are taken directly from Def. 56.1 without reference to Pl. 56.1.

[4]   *See* Def. 56.1 ¶ 1.

[5]   *See id.* ¶ 2.

[6]   *See id.*

[7]   *See id.* ¶ 3.

2

S&C's Reproduction & Photocopy Department, located on the 28th floor, where she worked at the time.[8] After this incident, plaintiff was out of work for eight consecutive work days, from October 11, 2004 to October 20, 2004.[9] Because Monterroso had already exhausted her sick leave for 2004, she was not paid for this absence until her claim was approved by the Firm's workers' compensation insurance carrier.[10] During her absence, Monterroso told the Firm's Secretarial Services Department that she would not return to work until she was transferred to a new position on a different floor.[11] S&C accommodated plaintiff's request and temporarily moved her into a floating position off the 28th floor.[12]

When Monterroso returned to work on October 21, 2004, she met with Susan Vahrenkamp and Catherine Kabelac, Director and Assistant Director of the Secretarial Services Department, respectively.[13] Vahrenkamp explained that because plaintiff did not want to work on the 28th floor, she would have to work

---

[8]  *See id.*

[9]  *See id.* ¶ 4.

[10]  *See id.* ¶ 5.

[11]  *See id.* ¶ 6.

[12]  *See id.* ¶ 7.

[13]  *See id.* ¶ 8.

3

in a floating position until a permanent position opened up on another floor.[14]
Monterroso floated for a period of time thereafter.[15] Although plaintiff was
offered permanent positions that subsequently became available, she refused them
because they involved assisting Firm partners.[16] On November 4, 2004, plaintiff
was given a stationary position on the 33rd floor, which continued for two months
despite a low workload.[17]

        Beginning on January 10, 2005, plaintiff was out of work for an
extended period because of back problems.[18] On February 25, 2005, plaintiff
notified the Firm that her doctor released her to return to work.[19] As with all
employees returning to work from disability leave after receiving a medical release
from their doctors, the Firm's Benefits Department asked Monterroso to provide a
"Fit to Return" note before returning to work.[20] Monterroso did so but the note

---

[14] *See id.*

[15] *See id.* ¶ 11.

[16] *See id.*

[17] *See id.* ¶ 12.

[18] *See id.* ¶ 13.

[19] *See id.* ¶ 14.

[20] *See id.* ¶ 15.

4

contained certain restrictions and stated that she had pain in her back and legs.[21] Because these restrictions were of concern to the Benefits Department, the Firm decided that plaintiff should undergo an Independent Medical Examination ("IME") before returning to work.[22] On March 16, 2005, the Firm received the results of the IME, which concluded that Monterroso could work within her job description.[23] On March 21, 2005, plaintiff was allowed to return to work, having been paid at full salary during her entire absence.[24]

On April 5, 2005, plaintiff left work and took a car service to an emergency room, claiming that she was having breathing difficulties attributable to cleaning solutions used by the Firm's Maintenance Department.[25] Monterroso called in sick the next day.[26] On May 18, 2005, accompanied by Kabelac, plaintiff took a car service to an emergency room, claiming that she had an asthmatic

---

[21] *See id.* ¶ 16.

[22] *See id.* ¶ 17.

[23] *See id.* ¶ 18. Defendant does not state whether Monterroso signed a formal authorization releasing the results of this IME to the Firm.

[24] *See id.* ¶ 20.

[25] *See id.* ¶ 23.

[26] *See id.*

5

reaction to furniture polish being used near her desk area.[27]  Monterroso called in

sick the next day.[28]  On May 25, 2005, plaintiff once again took a car service to an

emergency room complaining of an asthmatic reaction to furniture polish and

called in sick the following two days.[29]

## B.  Documentation Regarding Plaintiff's Medical Condition

After Monterroso's last absence on May 25, 2005, the Firm decided

that she should have another IME to assess her physical limitations and determine

if she could  return to work safely.[30]  Vahrenkamp informed Monterroso that she

needed to obtain a medical report from a pulmonologist so that the Firm could

assess the need for and feasability of an accommodation.[31]  Plaintiff was also told

that she was being placed on paid administrative leave until she complied with the

Firm's request for medical information.[32]

---

[27]  *See id.* ¶ 25.

[28]  *See id.*

[29]  *See id.* ¶ 26.

[30]  *See id.* ¶ 27.  This decision was made in conjunction with the Firm's workers' compensation insurance carrier.  *See id.*  Plaintiff underwent a workers' compensation IME on June 23, 2005.  *See id.* ¶ 35.

[31]  *See id.* ¶ 28.

[32]  *See id.* ¶ 29.

6

On May 27, 2005, the Firm received a letter from Dr. James L. Bruno,

plaintiff's pulmonologist, stating that Monterroso "should not be exposed to

pulmonary-offending agents such as chemicals, fumes, toxins, etc. as these

harmful exposures will worsen her respiratory condition."[33] Dr. Bruno also sent a

"Fit to Return" note, dated May 31, 2005, which referenced his May 27th letter.[34]

To better assess an appropriate accommodation, the Firm requested more specific

information concerning Dr. Bruno's general reference to "pulmonary-offending

agents."[35] Therefore, on June 1, 2005, Melanie Corpuz, Director of the Benefits

Department, wrote to Dr. Bruno and requested a list of the "pulmonary-offending

agents" and more specific descriptions, if available.[36] Having received no

response, Corpuz followed up with a phone call to Dr. Bruno's office on June 8,

2005, and spoke with his wife, Elizabeth Bruno.[37] Mrs. Bruno told Corpuz that

Dr. Bruno stated that it was impossible to pinpoint the exact causes of

---

[33]  *Id.* ¶ 30.

[34]  *See id.*

[35]  *Id.* ¶ 31.

[36]  6/1/05 Letter from Corpuz to Dr. Bruno, Ex. 1 to the Affidavit of Melanie Corpuz in Support of Defendant's Motion for Summary Judgment, dated July 11, 2008 ("Corpuz Aff.").

[37]  *See* Def. 56.1 ¶ 32.

7

Monterroso's asthma attacks, but that she would try to get more detailed information from Dr. Bruno.[38] On June 9, 2005, Corpuz again spoke with Mrs. Bruno who allegedly informed her that Monterroso called the office and prohibited Dr. Bruno from responding any further to the Firm's inquiries regarding her medical condition.[39]

In support of the argument that Monterroso interfered with the release of her medical information, S&C points to a HIPAA form signed by Monterroso on October 20, 2004, which prevented Dr. Bruno from disclosing Monterroso's Personal Health Information to the Firm.[40] However, on June 9, 2005, Monterroso signed another HIPAA form authorizing the disclosure of a letter from Dr. Bruno, dated May 27, 2005, to the Firm.[41] Thus, the June 9, 2005 Authorization effectively negated the prohibition contained in the October 20, 2004 form.

On July 12, 2005, and again on August 3, 2005, Corpuz wrote to Monterroso asking her to authorize Dr. Bruno to provide the Firm with more

---

[38] *See id.*

[39] *See id.* ¶ 33.

[40] *See* Request for Restriction of Protected Health Information, Ex. 6 to the Corpuz Aff..

[41] *See* Authorization for Use and Disclosure of Protected Health Information, Ex. 3 to the Corpuz Aff.

8

specific descriptions regarding the "pulmonary-offending agents" referred to in his first May 27th letter.[42] Corpuz also asked Monterroso to provide authorization for the release of the results of her June 23, 2005 IME to the Firm.[43]

In reply, Dr. Bruno wrote another letter, also dated May 27, 2005,[44] which states that Monterroso "has a history of irritant induced asthma which may be exacerbated by exposure to various chemicals, fumes in the air. Exposures to these pulmonary offending agents may worsen her respiratory condition."[45] Dr. Bruno also wrote a letter, dated August 10, 2005, which states that Monterroso "was advised to avoid exposure to all irritants such as chemicals, fumes, smoke, dust, etc. as these may trigger an asthma attack."[46]

---

[42] *See* Def. 56.1 ¶ 36.

[43] *See id.*

[44] Dr. Bruno attributes the incorrect date of this second letter to an error by his typist. *See* Deposition of Dr. James Bruno, Ex. 2 to the Pl. Aff., at 61.

[45] 5/27/05 Letter From Dr. Bruno, Ex. 2 to the Pl. Aff.

[46] 8/10/05 Letter From Dr. Bruno, Ex. 2 to the Pl. Aff. Apparently, the Firm never received Dr. Bruno's August 10, 2005 letter. *See* Affidavit of Sharron Davis in Support of Defendant's Motion for Summary Judgment, dated July 14, 2008 ("Davis Aff.") ¶ 6.

In response to Corpuz's August 3rd letter, Monterroso sent Corpuz a

hand-written letter dated August 9, 2005.[47] In this letter, Monterroso claimed that

she and Dr. Bruno sufficiently responded to the Firm's requests for medical

information.[48] With regard to the release of her June 23, 2005 IME, Monterroso

stated as follows:

> Regarding your fourth paragraph numbered 2, Chubb has not, to this date, sent me a release regarding the IME on June 23, 2005. This is a Worker's Compensation issue. You may contact my attorney, Daniel Savino, Esq. . . . To state [that] I have not signed a release I am not in possession of is clearly another false statement. Mr. Savino may be able to assist you with this matter and he will determine the release of the June 23, 2005 IME.[49]

---

[47] *See* 8/9/05 Letter from Monterroso to Corpuz, Ex. 5 to the Corpuz Aff.

[48] *See id.* at 3 ("As you can see by both Attachment 1 [first May 27, 2005 letter] and Attachment 2 [second May 27, 2005 letter] and the enclosed release my physician and I have responded to your numerous requests several times and to state otherwise is false.").

[49] *Id.* at 3-4. New York's Workers' Compensation Law states that:

> A copy of each report of independent medical examination shall be submitted by the practitioner on the same day and in the same manner to the board, the insurance carrier, the claimant's attending physician or other attending practitioner, the claimant's representative and the claimant.

N.Y. Workers' Compensation Law § 137(1)(a) (McKinney 2006).

Sharron Davis, Director of S&C's Human Resources Department,

sent a letter to Monterroso, dated August 17, 2005, which included a release

authorizing Dr. Bruno to discuss potential workplace accommodations with the

Firm.[50] Davis' letter also included a release of the results of plaintiff's June 23,

2005 IME.[51] Davis warned Monterroso that her "continued refusal to provide the

reasonable documentation requested may leave [S&C] with no alternative but to

end your employment."[52]

Monterroso responded to Davis' requests with a letter dated August

24, 2005.[53] In that letter, Monterroso explained that Dr. Bruno was preparing a

"fourth letter regarding information for the necessary accommodation."[54] With

regard to her June 23, 2005 IME, plaintiff wrote:

> As stated previously, you may contact my attorney, Daniel
> Savino, Esq. . . . regarding the June 23, 2005 IME. This is

---

[50] *See* Def. 56.1 ¶ 38. Whether this informal release would have been of legal effect is questionable given that so-called "speaking authorizations" are usually accomplished through the use of formal, HIPAA-compliant authorizations.

[51] *See id.*

[52] 8/17/05 Letter from Davis to Monterroso, Ex. 1 to the Davis Aff., at 2.

[53] 8/24/05 Letter from Monterroso to Davis, Ex. 2 to the Davis Aff.

[54] *Id.* at 1.

> a Workers Compensation issue and Mr. Savino will help
> you with this. His telephone number is . . . . [55]

On September 14, 2005, plaintiff forwarded to S&C a letter from Dr.

Bruno, dated August 24, 2005.[56] In this letter, Dr. Bruno stated that Monterroso

was "advised to avoid exposure to all irritants such as chemicals, fumes, smoke,

dust, etc. as these may trigger an asthma attack."[57] This letter also provided the

following list of irritants that, *according to Monterroso*, "existed in her work place

and triggered her asthma attacks:

> Aerosol furniture polish
> Aerosol disinfectants/cleaners/hairspray
> Cigarette/cigar smoke
> Asbestos
> Heavy exhaust fumes
> Reproduction chemicals
> Ammonia, heavy cleaning products"[58]

---

[55] *Id.* at 3.

[56] 8/24/05 Letter From Dr. Bruno, Ex. 3 to the Davis Aff.

[57] *Id.* Although Dr. Bruno's August 24, 2005 letter advises against exposure to "all irritants," plaintiff did not request a completely irritant-free environment. Rather, she restricted her request for reasonable accommodation to a "no propellant" policy whereby propellants would not be used near her work area during working hours. Plaintiff suggested the use of wipes instead. *See infra* Part III.A.3.

[58] *Id.*

12

On December 2, 2005, Monterroso was placed on unpaid administrative leave because, according to S&C, she failed to: (1) comply with S&C's repeated requests for reasonable medical documentation; and (2) release the results of her June 23, 2005 IME to the Firm.[59] S&C terminated Monterroso's employment on March 10, 2006, because she failed to provide the Firm with the information requested.[60]

## C. Available Medications

Dr. Bruno repeatedly advised Monterroso to use asthma maintenance medications to control her asthma symptoms but she repeatedly refused to use such medications.[61] Monterroso also refused to take non-steroidal asthma maintenance medications that Dr. Bruno recommended.[62] In addition to maintenance medications, Dr. Bruno prescribed plaintiff an Albuterol inhaler to quickly alleviate the symptoms of an asthma attack on an as needed basis.[63] At her deposition, plaintiff testified that she did not regularly carry the inhaler with her

---

[59]   *See* 12/02/05 Letter from Davis to Monterroso, Ex. 4 to the Davis Aff.

[60]   *See* 3/10/06 Letter from Davis to Monterroso, Ex. 5 to the Davis Aff.

[61]   *See* Def. 56.1 ¶ 46.

[62]   *See id.* ¶ 47.

[63]   *See id.* ¶ 48. Albuterol is a rescue medication commonly used at the onset of an asthma attack.

13

and that she never used it to control her symptoms while at work.[64] Instead, whenever plaintiff suffered an asthma attack at the Firm, she would seek emergency room care where she would be treated with Albuterol and steroids.[65]

In response to these allegations, Monterroso avers that she has "severe side effects to asthma medications including insomnia, palpitations and jitteriness."[66] These side effects are corroborated, at least in part, by Dr. Peter Perdik who wrote the following Progress Note on August 3, 2001: "Assessment: Asthmatic-Reactive Airways Disease which is triggered by environmental factors in work place. Symptomatic treatment not used due to adverse reaction (i.e. jitteriness)."[67] According to Monterroso, Dr. Perdik advised her not to use Albuterol at work because Albuterol would open up her lungs, thereby exposing her to more of the irritant and causing a more severe attack.[68] Monterroso testified

---

[64] *See id.* ¶ 49.

[65] *See id.* ¶ 50.

[66] Pl. Aff. ¶ 4.

[67] 8/3/01 Progress Notes from Dr. Peter Perdik ("Progress Notes"), Ex. 2 to the Pl. Aff.

[68] *See* Deposition of Cynthia Monterroso, dated March 27, 2008 ("Pl. Dep."), Ex. 1 to the Declaration of Robin D. Fessel in Support of Defendant's Motion for Summary Judgment, dated July 14, 2008 ("Fessel Decl."), at 81-82 ("I didn't even use [Albuterol] at work because [Dr. Perdik] told me to remove myself because if you open your lungs to what is giving you the asthma attack you'll have a more

that she used Albuterol while at the hospital but that it made her very, very sick.[69] Monterroso further testified that when she was given steroids at the hospital, such as Prednisone, she suffered very adverse reactions.[70]

## II. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[71] "'A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[72] A fact is material when it "'might affect the

---

severe attack."). *See also* Progress Notes (other than symptomatic treatment with medications, and the concomitant side effects, Dr. Perdik stated that the "[o]nly other recommendation would be avoidance of exacerbating factors" such as "hair products, cleaning products, cigarette and cigar smoke in an enclosed space at work").

[69] *See* Pl. Dep. at 83.

[70] *See id.* at 84 ("I have a very, very bad, bad effect with steroids.").

[71] Fed. R. Civ. P. 56(c).

[72] *Stuart v. American Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir. 1998) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). *Accord Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006).

15

outcome of the suit under the governing law.'"[73] "It is the movant's burden to show that no genuine factual dispute exists."[74]

      In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. "Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"[75] To do so, the non-moving party must do more than show that there is "'some metaphysical doubt as to the material facts,'"[76] and it "'may not rely on conclusory allegations or unsubstantiated

---

[73] *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (quoting *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005)).

[74] *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

[75] *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). *Accord In re September 11 Litig.*, 500 F. Supp. 2d 356, 361 (S.D.N.Y. 2007) ("Where the nonmoving party bears the burden of proof at trial, 'the burden on the moving party may be discharged by "showing" – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'") (quoting *Celotex*, 477 U.S. at 325).

[76] *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

16

speculation.'"[77] However, "'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"[78]

In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.[79] However, "[i]t is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'"[80] Summary judgment is therefore "only appropriate when there is no genuine issue as to any material fact, making judgment appropriate as a matter of law."[81]

---

[77] *Jeffreys*, 426 F.3d at 554 (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2002)).

[78] *McClellan*, 439 F.3d at 144 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)).

[79] *See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 456 (2d Cir. 2007) (citing *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)).

[80] *McClellan*, 439 F.3d at 144 (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)). *Accord Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986).

[81] *Karpova v. Snow*, 497 F.3d 262, 270 (2d Cir. 2007) (citing *Tocker v. Philip Morris Cos.*, 470 F.3d 481, 486-87 (2d Cir. 2006)).

The submissions of a pro se party should be held "'to less stringent standards than formal pleadings drafted by lawyers . . . .'"[82] District courts should "read the pleadings of a pro se plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest.'"[83] These same principles apply to briefs and opposition papers submitted by pro se litigants.[84] Nonetheless, proceeding pro se "does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment."[85]

## B. ADA

The ADA creates a private right of action for disability-based employment discrimination.[86] In order to establish a prima facie case of discrimination under the ADA, a plaintiff must show that: (a) her employer is

---

[82] *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (per curiam) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)).

[83] *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

[84] *See Ortiz v. McBride*, 323 F.3d 191, 194 (2d Cir. 2003); *Burgos*, 14 F.3d at 790.

[85] *Cole v. Artuz*, No. 93 Civ. 5981, 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

[86] *See* 42 U.S.C. § 12112(a).

18

subject to the ADA; (b) she is disabled within the meaning of the ADA or perceived to be so by her employer; (c) she was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (d) she suffered an adverse employment action because of her disability.[87] Under the ADA, discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."[88] Thus, to establish a prima facie reasonable accommodation case, a plaintiff must show that: " (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations."[89]

---

[87] *See Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 198 (2d Cir. 2004).

[88] 42 U.S.C. § 12112(b)(5)(A). *See also* 29 C.F.R. § 1630.9(a).

[89] *Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004). *See also* 42 U.S.C. § 12111(8) (defining a "qualified individual with a disability" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires"); *id.* § 12112(b)(5)(A) (defining "discriminate" to include a

## III. DISCUSSION

### A. Plaintiff's Reasonable Accommodation Claim

Defendant argues that plaintiff's failure to accommodate her asthma claim fails for the following reasons: (1) plaintiff is not disabled when corrective measures are considered; (2) plaintiff refused to engage in the interactive process required by the ADA; and (3) the accommodation plaintiff sought was not reasonable. There are, however, material issues of fact with regard to each of these arguments.

#### 1. Plaintiff's Status as an ADA Qualified Individual

The ADA defines a qualified individual with a disability as someone who has an impairment that substantially limits one or more of the individual's major life activities, or has a record of the impairment, or is regarded as having an impairment.[90] "Under the ADA, major life activities are defined as 'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working.'"[91] Defendant argues that plaintiff is not a

failure to make reasonable accommodations unless undue hardship would result).

[90] *See* 42 U.S.C. § 12102(2)(A).

[91] *Caruso v. Camilleri*, No. 04-CV-167A, 2008 WL 170321, at *16 (W.D.N.Y. Jan. 15, 2008) (quoting 29 C.F.R. § 1630.2(i)).

20

qualified individual under the ADA because corrective medications would have alleviated her asthma. In determining whether an individual is disabled under the ADA, courts must account for any corrective or mitigating measures that could potentially be used by that individual.[92] Where an individual fails to use available corrective measures, courts evaluate that individual's claimed disability as if she had used those measures.[93]

Here, defendant relies on the deposition testimony of Dr. Bruno to point out that plaintiff chose not to take corrective medications to help control her asthma. Dr. Bruno repeatedly recommended that plaintiff use both a daily

---

[92] *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482–83 (1999) ("A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity."); *Murphy v. United Parcel Serv.*, 527 U.S. 516, 521 (1999) ("[T]he determination of petitioner's disability is made with reference to the mitigating measures he employs."); *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 565 (1999) ("[M]itigating measures must be taken into account in judging whether an individual possesses a disability.").

[93] *See, e.g., Johnson v. Maynard*, No. 01 Civ. 7393, 2003 WL 548754, at *4 (S.D.N.Y. Feb. 25, 2003) ("Since plaintiff had medication available to her, and knew that she could function normally if she took it, she cannot be said to have been substantially impaired if she neglected to avail herself of such corrective measures."); *Hewitt v. Alcan Aluminum Corp.*, 185 F. Supp. 2d 183, 189 (N.D.N.Y. 2001) (holding that a plaintiff who does not use an available corrective medication "is not a qualified individual under the ADA"); *Tangires v. The Johns Hopkins Hosp.*, 79 F. Supp. 2d 587, 596 (D. Md. 2000) ("Since plaintiff's asthma is correctable by medication and since she voluntarily refused the recommended medication, her asthma did not substantially limit her in any major life activity.").

maintenance medication, to diminish the effects of an asthma attack, and an

Albuterol inhaler, a rescue medication, to alleviate the symptoms of an asthma

attack.[94] Dr. Bruno did not testify that maintenance medications would have

definitely controlled plaintiff's asthma. Rather, Dr. Bruno testified that

maintenance medications, such as steroids or Singulair, *"could have"* managed

plaintiff's asthma.[95] Indeed, Dr. Bruno's primary recommendation was avoidance

therapy:

> [I]f you have a cat allergy the first thing I would tell you is
> you got to get rid of the cat. Most people would get rid of
> their husband or their wife before their cat, that's been my
> experience in all these years, so that doesn't work. The
> second thing is you give them a medication to minimize the
> attack that they would get when they play with their cat.
> And although that's not a hundred percent it's better than
> nothing. And it's not the preferred treatment, the preferred
> treatment is to avoid the in[ci]ting thing.[96]

---

[94] *See* Deposition Testimony of Dr. James Bruno, dated April 18, 2008, Ex. 2 to the Fessel Decl., at 30-33.

[95] *Id.* at 30, 31 (stating that maintenance medications "would potentially alleviate the severity of the symptoms").

[96] *Id.* at 31-32. *See also id.* at 26 ("In other words, if I spray something in your face, 15 minutes later you start choking, gasping, wheezing you'll have an asthma attack, you'll have an upper airway irritation. If you go outside and you breath fresh air or you remove yourself from that situation, normally it resolves over time or goes away without even treatment, with just fresh air.").

Avoidance therapy, which was recommended by both Dr. Bruno and Dr. Perdik, seems to be reasonable under the circumstances.[97] This is especially so given the adverse side effects plaintiff experienced when she used both maintenance and rescue medications. In any event, there is a genuine issue of material fact as to whether Monterroso's asthma could have and would have been controlled with medication to the degree that she would no longer qualify as disabled under the ADA. Accordingly, defendant's motion for summary judgment based on the reasonable accommodation prong is denied because there is a disputed issue of fact as to whether plaintiff would still be an ADA-qualified individual if she took corrective medications.

## 2.    The ADA's Interactive Process

The ADA requires an "'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated."[98] An employee seeking an accommodation is obliged

---

[97]    In fact, Dr. Bruno apparently advocates avoidance therapy for patients with environmentally triggered asthma. *See* Dr. Bruno Dep., Ex. 2 to the Pl. Aff., at 73 ("[I]f a patient reports to me something in their environment my answer is avoidance of that generically, that's the treatment and I wouldn't be doing my job as a doctor if I didn't say that. . . . [T]he bottom line is avoidance therapy and that's what we say. There's no other medical answer but avoidance therapy.").

[98]    *Felix v. New York City Transit. Auth.*, 154 F. Supp. 2d 640, 658 (S.D.N.Y. 2001) (quoting *Jackan v. New York State Dep't of Labor*, 205 F.3d 562, 566 (2d

23

to participate in this interactive process in order to help the employer identify the "precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations."[99]  An employee's provision of medical information is an indispensable aspect of that interactive process and where an employee fails to provide documentation sufficient to allow an employer to assess the parameters of the employee's disability, "ADA liability simply does not follow."[100]

S&C argues that Monterroso refused to participate in the interactive process by: (1) refusing to provide the Firm with medical information that would substantiate her claimed disability and help the parties identify potential accommodations; and (2) providing only vague and conclusory information about her alleged disability.  According to S&C, Monterroso refused to provide any medical information that would clarify the precise limitations of her alleged disability.  In May 2005, the Firm placed plaintiff on paid administrative leave

---

Cir. 2000)).

[99]  29 C.F.R. § 1630.2(o)(3).

[100] *Beck v. University of Wisc. Bd. of Regents*, 75 F.3d 1130, 1137 (7th Cir. 1996).  *Accord Templeton v. Neodata Servs., Inc.*, 162 F.3d 617, 619 (10th Cir. 1998) ("[T]he employee's failure to provide medical information necessary to the interactive process precludes her from claiming that the employer violated the ADA by failing to provide reasonable accommodation.").

pending receipt of medical information, including the results of the June 23, 2005 IME, detailing the physical limitations related to her alleged asthma. The Firm wrote three letters to plaintiff, on July 12, August 3 and August 17, 2005, asking her to authorize Dr. Bruno to provide the Firm with more specific information regarding her asthma. S&C argues that the information plaintiff provided was vague and conclusory given the three allegedly repetitive and cursory letters from Dr. Bruno. Two of Dr. Bruno's letters, both dated May 27, 2005, refer generally to "pulmonary-offending agents" and irritants such as "chemicals," "fumes," and "toxins" as the cause of plaintiff's asthma. Dr. Bruno's third letter, dated August 24, 2005, contains a list of specific irritants that Monterroso reported to Dr. Bruno as triggering her asthma. S&C argues that these letters, as well as plaintiff's failure to formally authorize the release of her June 23, 2005 IME, constitute a failure to engage in the interactive process mandated by the ADA.

Upon reviewing the entire record, I cannot conclude, as a matter of law, that plaintiff failed to engage in the interactive process. For example, plaintiff's failure to formally authorize the release of her June 23, 2005 IME results to S&C raises a question of fact. The Statement of Rights and Obligations for IMEs under section 137 of the Workers' Compensation Law states that: "Pursuant to 45 CFR 512 a health care provider who has been retained by an

25

employer or carrier to evaluate a workplace injury is exempt from HIPAA's restrictions on disclosure of health information."[101] Plaintiff cites this provision in support of her argument that a formal authorization was not required for the Firm to obtain the results of her IME.[102] Moreover, in her August 9 and August 24, 2005 letters, plaintiff expressly authorized S&C to contact her worker's compensation attorney, Daniel Savino, regarding the release of her June 23, 2005 IME.[103] Accordingly, S&C may have had access to the results of the June IME despite plaintiff's failure to sign a formal HIPAA release or the release appended to Davis' August 17, 2005 letter to Monterroso. The fact that S&C insisted on a

---

[101] Statement of Rights and Obligations, Independent Medical Examinations, Section 137 WCL, Ex. 12 to the Pl. Aff.

[102] *See* Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment at 3 ("S&C also had significant amounts of medical information given to them by their Workers' Compensation ("WC") insurer, Chubb, and at all times medical information [was] available to them as an employer involved in a workers' compensation case in New York State under Section 137."). Indeed, there is no mention by either party of a formal authorization with regard to the results of plaintiff's first IME. *See* Corpuz Aff. ¶ 8 ("My Department received the IME results on March 16, 2005.").

[103] Under the Workers' Compensation Law, a copy of each IME report shall be sent to the Workers' Compensation Board, the insurance carrier (here, Chubb), the claimant's attending physician, the claimant's representative (here, Daniel Savino), and the claimant.

26

release that it may not have needed is not persuasive evidence of plaintiff's alleged failure to engage in the ADA's interactive process.

In addition, both of Dr. Bruno's May 27, 2005 letters include the following language: "If you have any questions or need further assistance, please feel free to call my office." Monterroso formally authorized the disclosure of at least one of Dr. Bruno's May 27, 2005 letters through an official HIPAA form. By doing so, Monterroso in effect authorized Dr. Bruno to speak to S&C.[104] Moreover, every time S&C requested more medical information, another letter from Dr. Bruno was provided. For example, in response to Corpuz's July 12 and August 3, 2005 letters to Monterroso, Dr. Bruno sent a second letter dated May 27, 2005. In response to Davis' August 17, 2005 letter to Monterroso, Dr. Bruno sent a letter dated August 24, 2005. As plaintiff correctly points out, she cannot dictate the form or content of Dr. Bruno's letters.[105] Nor should Monterroso be penalized

---

[104] The allegation that Mrs. Bruno told Corpuz that Monterroso prohibited Dr. Bruno from further discussing her medical information is inadmissible hearsay and, as such, cannot be considered on a motion for summary judgment. *See* Fed. R. Civ. P. 56(e)(1) (stating that affidavit opposing summary judgment "must be made on personal knowledge, set [ting] out facts that would be admissible in evidence"); *Feingold v. New York*, 366 F.3d 138, 155 n. 17 (2d Cir. 2004) ("In reviewing the district court's grant of summary judgment . . . we may only consider admissible testimony.").

[105] *See* 8/24/05 Letter from Monterroso to Davis, Ex. 12 to the Pl. Aff., at 2 ("I cannot force Dr. Bruno to prepare a letter with facts of S&C's choosing. Dr.

27

for what S&C perceives as deficiencies in the content of Dr. Bruno's letters. Moreover, S&C's argument that the allegedly scant information provided by Monterroso was insufficient to identify any potential reasonable accommodations is somewhat disingenuous. Given the detailed list of irritants in Dr. Bruno's August 24, 2005 letter, it is reasonable to infer that plaintiff could be accommodated by not being exposed to these irritants. It is not terribly difficult to make this logical leap. I therefore find that whether Monterroso sufficiently engaged in the interactive process presents a material question of fact. Thus, Monterroso's reasonable accommodation claim cannot be dismissed on the ground that she failed to do so.

### 3. The Reasonableness of the Requested Accommodation

The ADA only requires employers to make "*reasonable* accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee."[106] An accommodation is "reasonable" only if it "'seems reasonable on its face, i.e.,

---

Bruno has, and will, respond in his own manner.").

[106] 42 U.S.C. § 12112(b)(5)(A) (emphasis added).

ordinarily or in the run of cases;' this means it is 'reasonable' if it appears to be 'feasible' or 'plausible.'"[107]

Here, Monterroso repeatedly asked for S&C to adopt a limited "no propellant" policy to accommodate her work related asthma.[108] For example, in her July 20, 2005 letter to Corpuz, Monterroso writes: "As you know, I have repeatedly requested a 'no propellant' policy to accommodate my work related asthma attacks."[109] This request was repeated in plaintiff's August 9, 2005 letter to Corpuz, as follows:

> I am continuing to request a no propellant policy ( i.e., instructing your Maintenance Department and S&C staff to use "wipes" (such as Pledge or Clorox wipes) instead of sprays or propelled cleaning agents or disinfectants. This is a reasonable accommodation. After all, most businesses do not clean and polish and paint in the middle of the work day when offices are fully staffed.[110]

Monterroso repeats this request in a letter to Davis, dated August 24, 2005, wherein she states: "I will remind you again, your Maintenance staff and

---

[107] EEOC, Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act (Oct. 17, 2002) (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002)).

[108] 7/20/05 Letter from Monterroso to Corpuz, Ex. 3 to the Corpuz Aff., at 2.

[109] *Id.*

[110] 8/9/05 Letter from Monterroso to Corpuz, Ex. 5 to the Corpuz Aff., at 4.

employees are the people spraying aerosols, causing work related injuries, and your lack of a 'no propellant' policy is responsible for the irritant induced work related asthma attacks I have had while working at S&C."[111]

S&C argues that Monterroso's demand for a "no propellant" policy is per se unreasonable given that its New York office employs hundreds of people and utilizes dozens of copiers, fax machines and printers placed throughout every floor of the office. S&C's position, in sum, is that it has no duty to "provid[e] a bubble for [plaintiff] to work in."[112] In support of the position, S&C cites a number of cases holding that requests for scent-free, fragrance-free and allergen-free environments are objectively unreasonable.[113] However, Monterroso did not ask for such a restricted environment; she asked only for a "no propellant" policy

---

[111] 8/24/05 Letter from Monterroso to Davis, Ex. 2 to the Davis Aff., at 2-3.

[112] *Buckles v. First Data Res., Inc.*, 176 F.3d 1098, 1101 (8th Cir. 1999) .

[113] *See, e.g., Kaufmann v. GMAC Mortgage Corp.*, No. 04 Civ. 5671, 2006 WL 1371185, at *13 (E.D. Pa. May 17, 2006) (holding that a "scent-free environment" was impractical, impossible, and objectively unreasonable under the ADA); *Montenez-Denman v. Slater*, No. 98-4426, 2000 WL 263279, at *2–3 (6th Cir. Mar. 1, 2000) (holding that a "fragrance-free workplace" was impractical, burdensome and objectively unreasonable under the Rehabilitation Act); *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 635 (6th Cir. 1998) (holding that an "allergen-free workplace" was vague and objectively unreasonable under the ADA). Because plaintiff did not request a dust-free, allergen-free or scent-free working environment, these cases are distinguishable.

30

whereby aerosols and other propelled disinfectants and cleaners would not be used near her work hour during business hours. Whether such a policy is feasible for a law firm like S&C is a question of fact that cannot be decided on summary judgment. The reasonableness of such a policy depends on a myriad of factors such as the number and types of propellants used, at what times they are used, for what purposes, and whether non-aerosol replacement products are available. Without this sort of evidence, this Court cannot hold that a "no propellant" policy is per se unreasonable. Accordingly, plaintiff's reasonable accommodation claim cannot be dismissed as objectively unreasonable.

**B.   Retaliation**

The ADA prohibits retaliation by an employer against its employees in relation to a disability discrimination claim by specifically providing that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."[114] Claims for retaliation are analyzed under the same burden-shifting framework established for Title VII

_____

[114] 42 U.S.C. § 12203(a).

31

cases."[115] In order to establish a prima facie case of retaliation, a plaintiff must show that: "(1) [s]he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against [her]; and (4) a causal connection exists between the alleged adverse action and the protected activity."[116]

Here, plaintiff engaged in protected activity by filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on July 21, 2005. S&C became aware of this activity no later than January 18, 2006, when it received a copy of the EEOC's right-to-sue letter to Monterroso. Although plaintiff was terminated on March 10, 2006, she was placed on unpaid administrative leave on December 2, 2005, less than five months after her EEOC filing. Being placed on unpaid leave and termination of employment constitute adverse employment actions.[117]

The Second Circuit has repeatedly held that a close temporal relationship between an employee's participation in protected activity and an

---

[115] *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).

[116] *Id.*

[117] *See Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999) (defining adverse employment action to include "discharge, refusal to hire, refusal to promote, demotion, *reduction in pay*, and reprimand") (emphasis added).

employer's adverse employment action can establish causation.[118] Moreover,

temporal proximity between the protected activity and the adverse employment

action is circumstantial evidence of retaliation.[119] Thus, given the timing between

the filing of the EEOC Charge and the dates plaintiff was placed on unpaid leave

and eventually terminated, Monterroso has established a prima facie case of

retaliation.

"Once a plaintiff establishes a prima facie case of retaliation, the

burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for

---

[118] *See, e.g., Cifra v. General Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) ("The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." (quotation marks omitted)); *Gorman-Bakos v. Cornell Coop. Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001) ("In this Circuit, a plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse [employment] action. This court has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action.") (quotation marks omitted and citation).

[119] *See Bennett v. Goord*, 343 F.3d 133, 139 (2d Cir. 2003) ("[W]here . . . circumstantial evidence of a retaliatory motive is sufficiently compelling, direct evidence is not invariably required."); *Gayle v. Gonyea*, 313 F.3d 677, 684 (2d Cir. 2002) ("[C]ircumstantial evidence may be . . . sufficient to raise a genuine issue of material fact to preclude a grant of summary judgment.").

the challenged employment decision."[120] If a defendant meets this burden, "the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation."[121] Here, S&C has articulated several legitimate, non-retaliatory reasons for the actions it took against Monterroso, namely, her refusal to formally release the results of her June 23, 2005 IME[122] and her chronic absenteeism.[123] Plaintiff has offered no evidence of pretext. Accordingly, plaintiff's ADA retaliation claim is hereby dismissed.

## C. Hostile Work Environment Claims

Plaintiff brings hostile work environment claims under both the ADA and Title VII. Under Title VII, an employee seeking to bring a hostile work environment claim must show that she: 1) is a member of a protected class; 2) that

---

[120] *Treglia*, 313 F.3d at 721.

[121] *Cifra*, 252 F.3d at 216.

[122] Although plaintiff's refusal to formally release the results of her IME raises a question of fact with regard to the ADA's interactive process, the Firm requested a formal release on numerous occasions. Such requests were legitimate, non-discriminatory demands given the Firm's perceived need for a formal release.

[123] "The ADA does not require employers to tolerate chronic absenteeism even when attendance problems are caused by an employee's disability." *Mescall v. Marra*, 49 F. Supp. 2d 365, 375 n.18 (S.D.N.Y. 1999) (quotation marks and citation omitted).

she suffered unwelcome harassment; 3) that she was harassed because of her membership in a protected class; and 4) that the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment.[124] Hostile work environment claims under the ADA are evaluated under the same standards as hostile work environment claims under Title VII.[125]

In support of her claim for a hostile work environment under Title VII, plaintiff alleges that a lawyer at the Firm referred to her as a "stupid Italian" on several occasions. Even assuming this allegation to be true, such isolated and sporadic conduct does not support a hostile work environment claim.[126] In addition, plaintiff failed to allege any discrimination based on Title VII in her EEOC Charge. Thus, plaintiff's discrimination and hostile work environment claims relating to national origin must be dismissed.[127]

---

[124] *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir. 1995).

[125] *See Disanto v. McGraw-Hill, Inc./Platt's Div.*, No. 97 Civ. 1090, 1998 WL 474136, at *5 (S.D.N.Y. Aug. 10, 1998).

[126] *See Carter v. Cornell Univ.*, 976 F. Supp. 224, 232 (S.D.N.Y. 1997) (holding that six racial slurs uttered over the course of three years did not constitute a hostile work environment under Title VII).

[127] *See Butts v. New York Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993) ("A district court only has jurisdiction to hear Title VII claims that

Although the Second Circuit has not expressly held that the ADA authorizes claims for hostile work environment, district courts have found that the ADA encompasses hostile work environment claims.[128] The standard, however, is a "demanding one," and a plaintiff must establish that the alleged harassment was "offensive, pervasive, and continuous enough" to create an abusive working environment.[129]

In support of her claim for hostile work environment under the ADA, plaintiff claims that: her salary was not raised in a timely fashion; she did not receive the salary continuation she was due; her medical information was discussed with other employees without her permission; and her assignments were changed at random. Some of these allegations, however, are time-barred. For example, plaintiff points to an incident on September 24, 2004, in which Firm management allegedly discussed her medical condition with another employee.[130]

---

either are included in an EEOC charge or are based on conduct subsequent to the EEOC charge which is 'reasonably related' to that alleged in the EEOC charge.").

[128] *See, e.g., De La Cruz* v. *Guilliani*, No. 00 Civ. 7102, 2002 WL 32830453, at *9 (S.D.N.Y. Aug. 26, 2002); *Scott* v. *Memorial Sloan-Kettering Cancer Ctr.*, 190 F. Supp. 2d 590, 599 (S.D.N.Y. 2002).

[129] *Scott*, 190 F. Supp. 2d at 599 (citing *Kotcher* v. *Rosa & Sullivan Appliance Ctr., Inc.*, 957 F.2d 59, 62–63 (2d Cir. 1992)).

[130] *See* 8/28/04 e-mail from Monterroso to Joanne Askew, Ex. 9 to the Pl. Aff. ("Openly discussing my medical problems with another employee would seem to

But this incident was more than 300 days before plaintiff filed her Charge with the EEOC.[131]  Moreover, there is no evidence that the environment at S&C was permeated with frequent, severe and offensive disability-related comments. The conduct of which plaintiff complains is far from "offensive, pervasive, and continuous enough" to meet the "demanding" standard for establishing an abusive working environment under the ADA.[132]  Plaintiff's hostile work environment claim under the ADA is therefore similarly dismissed.[133]

---

be my choice, however, having a management member discuss my medical situation with another employee without me being present seems in the least very odd.").

[131] *See Urmey v. AT&T Corp.*, 438 F. Supp. 2d 369, 375 (S.D.N.Y. 2006) ("Where, as here, the state within which the alleged act of discrimination occurred has a law prohibiting discrimination in employment and authorizes a state agency to enforce that law, a charge of discrimination under the ADA and Title VII must be filed within 300 days after the alleged unlawful act occurred.") (citing 42 U.S.C. §§ 2000e-5(e)(1) and 12117(a)).

[132] *Scott*, 190 F. Supp. 2d at 599.

[133] At trial, plaintiff may attempt to prove that the components making up her ADA hostile work environment claim constitute separate, actionable incidents of disability-based discrimination even though they do not, in the aggregate, create a hostile work environment.

## IV.    CONCLUSION

For the reasons stated above, plaintiff's reasonable accommodation claim survives summary judgment while her retaliation and hostile work environment claims are dismissed. The Clerk of the Court is directed to close this motion (Document # 36 ). Plaintiff is hereby directed to contact this Court's Pro Se Office regarding the appointment of counsel from the pro bono panel. A status conference is scheduled for November 5, 2008, at 4:00 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:    New York, New York
          October 27, 2008

## - Appearances -

**Plaintiff (Pro Se):**

Cynthia Monterroso
318 Colony Avenue
Staten Island, NY 10306

**For Defendant:**

Robin D. Fessel, Esq.
Lisa M. White, Esq.
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
(212) 558-4000